COURT OF APPEALS
DECISION
DATED AND FILED

March 31, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP74-CR**

Cir. Ct. No. 2020CF2541

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JASMINE C. DANIELS,

DEFENDANT-APPELLANT

---

APPEAL from a judgment of the circuit court for Milwaukee County: DAVID L. BOROWSKI, Judge. *Reversed and cause remanded*.

Before White, C.J., Colón, P.J., and Geenen, J.

¶1 WHITE, C.J. Jasmine C. Daniels appeals her judgment of conviction entered after she pled guilty to neglecting a child where the consequence is death. She argues that the circuit court erred when it denied her motion to suppress her custodial statements, which were made after she invoked

her right to counsel but was erroneously informed by police detectives that an attorney was not available.

¶2 We conclude that the circuit court's findings of fact regarding this issue were clearly erroneous, and that Daniels' waiver of her right to counsel was not knowing, voluntary, and intelligent. We therefore reverse the order denying her motion to suppress, and remand this matter with directions to grant the motion.

## BACKGROUND

¶3 The charge against Daniels stemmed from the shooting death of her two-year-old daughter, Z.M.S., in July 2020, at a Milwaukee residence. A neighbor heard a gunshot inside the residence, and then observed Daniels run outside holding a small child who was covered in blood. That neighbor also observed a male with a gun in his waistband exit the residence and get into a silver vehicle. The police and paramedics were called and life-saving measures were performed on Z.M.S., but she was pronounced dead while she was being transported to the hospital.

¶4 Daniels provided different versions of the incident to police. First, she said that Z.M.S. had been shot during a drive-by shooting. However, the officers who secured the scene observed a trail of blood leading into the residence and down to the basement where Daniels lived, where there was a pool of blood. When confronted with this information, Daniels changed her story, instead stating that her three-year-old son, J.D., had accidentally shot Z.M.S. with a gun that Daniels had found in the park. The officers asked to enter the residence to search for the gun, but Daniels refused, saying "you won't find it." Daniels was arrested for obstruction.

¶5    The police obtained a search warrant for the basement of the residence. No gun was found. Additionally, officers reviewed surveillance video of the outside of the residence from just after the shooting. The video showed Trayell Nettles, the father of Daniels' youngest child, exiting the residence with a gun as Daniels carried out a bleeding Z.M.S. Nettles left the scene and was in a car accident approximately five minutes after the shooting; he brandished the firearm at the people in the other vehicle, telling them not to report the accident, before fleeing that scene.

¶6    The police conducted several custodial interviews of Daniels. In the first interview, she again stated that J.D. had accidently shot Z.M.S., and maintained that she and the children were the only people in the basement at the time of the shooting. During a second custodial interview, approximately thirteen hours later, Daniels said that it was not J.D. who had shot Z.M.S., but rather an unknown man who had come into the basement and started cleaning a gun, and then fled after firing the gunshot. During a third interview, in the early morning hours the following day, Daniels said that a person named Eddie, who was wearing all black, had shot Z.M.S. However, no one matching either of those descriptions was seen on the surveillance video. Furthermore, Daniels denied that Nettles was at the residence, even though he was seen on video leaving the residence after the shooting. Daniels also had no explanation of where the gun had gone.

¶7    Finally, Daniels confessed during the third interview that she had accidentally shot Z.M.S. while "playing with the rack on the gun." Daniels was charged with first-degree reckless homicide.

¶8      Daniels filed a motion to suppress her custodial statements, arguing that she had invoked her right to counsel, and that her statements were coerced and therefore involuntary.  The record indicates that Daniels requested an attorney at the beginning of her first custodial interview, at approximately 3:00 a.m.  She was informed by the detectives that an attorney would not be available until about 9:00 a.m.  She then agreed to speak with the detectives.

¶9      At the suppression hearing, Daniels argued that the detectives misinformed her about the availability of an attorney during her first interview. She asserted that a public defender is on call twenty-four hours a day and seven days a week to provide representation at custodial interviews.  The State argued that the detectives were not aware of the availability of an on-call public defender. The detectives did not testify at the hearing, however, so the State instead offered to provide affidavits from the detectives regarding their knowledge on public defender availability.  No affidavits were ever filed.

¶10      In contrast, Daniels filed an affidavit from the Regional Attorney Manager for the Milwaukee Trial Office of the State Public Defender (SPD) regarding the availability of a public defender for custodial interviews.   The affidavit stated that an attorney is "available on a 24/7 basis," and the SPD had provided a contact phone number to the Milwaukee Police Department (MPD) for this service when it was implemented in 1978.  The affidavit furthers avers that the MPD regularly calls that number several times each month.

¶11      Daniels also argued that her confession was coerced based on her "cognitive abilities, education, and mental health at the time of the interrogations." She indicated that she lost another child to SIDS a few months prior to this incident, had limited education and cognitive difficulties, and had been sexually

assaulted as a teenager. Daniels thus alleged the tactics used by the detectives during the first custodial interview were coercive, such as telling her that she was a "horrible person," and that although she had given birth to her children she was "no mother."

¶12 In its findings on the motion to suppress, the circuit court agreed with the State that the detectives likely did not know about the availability of a public defender. The court indicated it found the State's assertion that the detectives lacked knowledge of the on-call SPD attorney to be credible because the court itself was not aware of this policy.

¶13 The circuit court further found that the detectives likely were not aware of Daniels' cognitive, educational, and mental health issues. The court acknowledged that the detectives were a "bit rough" at times and "pretty forceful" during the first interview, but stated it believed that conduct was due to their being "frustrated" and "pissed off" about Daniels' lack of cooperation, and because they clearly believed she was lying.

¶14 The circuit court denied Daniels' motion to suppress. Approximately one week later, Daniels entered a guilty plea to an amended charge of neglecting a child where the consequence is death. The circuit court imposed an evenly bifurcated sixteen-year sentence. This appeal follows.[1]

---

[1] Appellate counsel for Daniels initially filed a no-merit report in this matter. Upon review of that report and the record, we rejected the no-merit report because we were unable to conclude that further proceedings to challenge the circuit court's denial of the motion to suppress would be wholly frivolous. *See State v. Daniels*, No. 2023AP1490-CRNM, unpublished op. and order (WI App Nov. 26, 2024).

**DISCUSSION**

¶15 On appeal, Daniels asserts that the circuit court erred in not suppressing her custodial statements. It is undisputed that she invoked her right to counsel during the first interview which took place at 3:00 a.m., when the detectives erroneously told her that an SPD attorney would not be available until around 9:00 a.m. Based on that misinformation, she argues that her waiver of her rights under ***Miranda v. Arizona***, 384 U.S. 436 (1966), was not knowing, intelligent, and voluntary.

¶16 This court reviews the circuit court's denial of a motion to suppress "under a two-part standard of review: we uphold the [circuit] court's findings of fact unless they are clearly erroneous, but review de novo whether those facts warrant suppression." ***State v. Conner***, 2012 WI App 105, ¶15, 344 Wis. 2d 233, 821 N.W.2d 267. "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." ***State v. Anderson***, 2019 WI 97, ¶20, 389 Wis. 2d 106, 935 N.W.2d 285.

¶17 Here, the circuit court's findings regarding the detectives' lack of knowledge of the availability of an SPD attorney are not supported by the evidence in the record. The court relied on the State's assertion that the detectives were not aware of the SPD's policy providing an on-call attorney. However, there is no testimony from either detective to corroborate that assertion; neither detective testified during the suppression hearing, nor did the State file affidavits from the detectives regarding their knowledge of the policy. Instead, the circuit court seemed to rely on its own knowledge, or lack thereof, regarding the on-call attorney policy through the SPD.

¶18    Furthermore, these purported findings stand in direct contrast to the information in the affidavit from the SPD regarding this long-standing availability policy. Moreover, the affidavit avers that MPD regularly utilizes this service. Therefore, as the circuit court's findings regarding the detectives' lack of knowledge of the availability of an SPD attorney are not supported by the evidence, they are clearly erroneous.[2] *See id.*

¶19    Continuing with our suppression review analysis, it was only after being erroneously told she was not able to consult with an attorney during the first interview that Daniels agreed to speak with detectives. She asserts that this does not demonstrate a voluntary waiver of her right to counsel. Whether a defendant's waiver of the right to counsel was knowing, voluntary, and intelligent is a question of law that we review de novo. *State v. Rejholec*, 2021 WI App 45, ¶16, 398 Wis. 2d 729, 963 N.W.2d 121.

¶20    Determining whether a waiver is voluntary "has two distinct dimensions." *Id.*, ¶29 (citation omitted). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (citation omitted). And "[s]econd, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (citation omitted). "Only if the 'totality of the

---

[2] We observe that the circuit court's findings relating to Daniels' argument regarding the detectives' tactics used during the first interview are also clearly erroneous. As previously noted, Daniels argued in her suppression motion that the tactics were coercive based on her cognitive abilities, education, and mental health issues related to her life experiences. The circuit court found that the detectives likely were not aware of these issues at the time of Daniels' interview; however, the record clearly indicates that at the beginning of the first interview, Daniels discussed those specific issues.

circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Rejholec*, 398 Wis. 2d 729, ¶29 (citation omitted).

¶21 The record shows that the detectives provided misinformation to Daniels about the availability of an attorney when she invoked her right to counsel. There is no evidence to support the credibility findings by the circuit court that this misinformation was not intentionally given. Furthermore, the affidavit from the SPD directly contradicts those credibility findings. Therefore, the totality of the circumstances here does not reflect both an uncoerced choice and a "requisite level of comprehension" on the part of Daniels when she agreed to speak to the detectives. *See id.* As a result, her waiver of her right to counsel was not knowing, intelligent, and voluntary. *See id.*

¶22 Nevertheless, the State asserts that even if we conclude that Daniels' statements from her first interview should be suppressed, her statements from her second and third interviews should not be suppressed because she reinitiated those interviews with the detectives, rendering them voluntary. However, in considering the totality of the circumstances, in conjunction with our conclusion that Daniels' waiver of counsel during the first interview was involuntary, we observe there is no evidence that in the time between the first and second interviews— approximately thirteen hours, over regular business hours—that any attempt was made to contact the SPD to honor Daniels' invocation of her right to counsel.

¶23 "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his [or her] privilege." *Id.*, ¶34 (citing *Miranda*, 384 U.S. at 476). Given the record

8

here, under the totality of the circumstances, we are unable to conclude that Daniels had the requisite level of comprehension to render her waiver of counsel voluntary in any of the interviews. *See **Rejholec***, 398 Wis. 2d 729, ¶29. Therefore, Daniels' waiver of her right to counsel during all of her custodial interviews was not knowing, intelligent, and voluntary. *See **id.***

## CONCLUSION

¶24    As a result, all of Daniels' custodial statements must be suppressed. We therefore reverse the order denying Daniels' motion to suppress, and remand this matter with directions to enter an order granting that motion.[3]

*By the Court.*—Judgment reversed and cause remanded with directions.

Not recommended for publication in the official reports.

---

[3] Upon Daniels' judgment of conviction being reversed, *see* WIS. STAT. § 808.03(3)(b), WIS. STAT. RULE 809.10(4), we note, and the State points out, that after entry of the order granting the motion to suppress, Daniels may file a motion to withdraw her guilty plea for the circuit court to entertain. *See **State v. Rejholec***, 2021 WI App 45, ¶35 & n.14, 398 Wis. 2d 729, 963 N.W.2d 121.

All references to the Wisconsin Statutes are to the 2023-24 version.